Thank you, Your Honor, Stephen Fischbein for Appellant, SS&C Technologies and Advent Software. Our first amended complaint sufficiently alleged that Arcesium used Geneva computer code, reporting methods and database architecture to design and test their competing product. I'm going to start with two concrete examples of allegations from our first amended complaint. These allegations need to be considered in the context of the undisputed legal framework that misappropriation is a very broad concept that includes not only copying, but any exploitation of a trade secret. And some examples of exploitation from the cases we cite in our brief, which Arcesium does not contest, are using a trade secret to do a comparative analysis, using a trade secret to develop competing software, and even reviewing a trade secret to develop one's own personal knowledge. So you're not saying the complaint doesn't allege copying? It does also allege copying. But I think the district court took a very narrow view and asked that there be an identical copy. And my point is that just that exploitation is much broader than that. And I think you'll see in some of the examples, there is some copying and some incorporation, but also other uses of trade secrets. So the first example is that Arcesium's Nautilus software used and incorporated Geneva technology so that they could secretly operate Geneva when Arcesium was prohibited from doing that. So, and we're just focusing on the allegations made in the First Amendment amended complaint. Currently, that's correct. So if you could just refer us to the paragraphs that you're focusing on. I will definitely do that. Because I want to be clear that we're not then looking to relying on the supplemental submissions. No, these, what I'm discussing now, the misappropriation, is in the First Amendment complaint. And I will give you paragraph numbers. OK, thank you. So the background is that after Arcesium's Geneva license expired, they still wanted to service customers who used Geneva, including new customers. And that's paragraphs 58 and 59. But because their license had expired, they no longer had rights to Geneva. And we allege that there was a new customer, a prospective customer that they were pitching, who explicitly told them that their access to Geneva, quote, won't be viable legally. That's paragraph 60. But could I interrupt you for a second? They were entitled for a period of time to continue to service existing customers, right, with the run-on rights. But it's the new customers who they were not entitled to introduce. Yeah. So there were four customers that they resold. At the time of the complaint, there was only one left. But the market they were looking at was much, much broader than those four customers. It included customers that used Geneva that they never had any relationship with before. Customer A, the one I'm talking about now, is a hedge fund that they had no prior relationship with. They were not authorized to use Geneva. Their license was over. And that customer told them specifically when they made a proposal, that won't be viable legally. And what we allege is that specifically to get around that legal bar, OK, to avoid that, Arcesium built their Nautilus application so that they could remotely access Geneva without SS&C knowing. Now, this Nautilus application incorporated and used Geneva computer code, what we refer to in the complaint as RSL files. And these are just computer programs for extracting data from a database and creating reports. Nautilus also used the Geneva loader, which is a tool for putting data into Geneva. In Arcesium, I think this is important, they admitted internally that this type of technology was SS&C's proprietary technology. Paragraph 62 quotes the Nautilus project manager saying loader formats are vendors' intellectual property and it's not appropriate to use them without permission. But that's what they did. And we allege in paragraph 63 to 66 that they incorporated these Geneva RSL files and Geneva loader into the Nautilus application. And of course, that's the only way they could get it to work. This is a standalone application on their side and their platform. And they're trying to execute commands in Geneva. So they needed this technology. That's an unauthorized use of Geneva code files and tools, clearly exploitation. Second example, Arcesium used Geneva reporting to enhance the reporting in its own platform. And here it's paragraphs 50 and 51. Paragraph 50 relates to a time period a few months before their license expired. And 51 is about four or five months after their license expired. So are you just talking about how accounting information was displayed, which presumably one could kind of intuit and have basic ideas about knowing nothing about your client's program? So, Your Honor, there's two aspects to the reporting. One aspect is the process, the technique, the methodology for pulling data out of a very complex database with lots and lots of different attributes. So what data you get from where, OK, that's the RSLs, report specification language. So that's part of it is how you get the data out. And the second part is how you put it together. Now, to your question, we are not saying here that the concept that was copied was, for example, accrued interest. The issue is what metrics at what level of granularity over what period of time? And if you look at these spreadsheets, what you'll see that they're looking at is they're saying we don't have enough granularity. We're not showing things by tax laws. We're not showing things by some other granularity. Or Geneva shows unsettled trades as well as settled trades. Geneva shows closed positions as well as unclosed positions. They show it for this period of time. So it's the it's the types of data and the level of granularity. And they're lining them up side by side. And so, for example, the chart, one of the charts they circulated literally has this is the way Arcesium does it. This is the way Geneva does it. And then that chart went up to the CEO and the CEO said, we have to keep our access to Geneva until we can fix all the problems in our platform. The second spreadsheet, which was after their license expired, also is a side by side comparison. Here's how Geneva does it. Here's how Arcesium does it. It notes that Arcesium is inaccurate. It's not reliable, that Geneva does it the right way. And then it has a column, action items, for how Arcesium is going to change their reports to make them like Geneva. I'm still having a little trouble understanding why types of data that a hedge fund manager might want are considered a trade secret. Because there's an infinite way, infinite number of ways to display and report data. Like you could have an interest report and it only covers unsettled trades or let's say open positions. In other words, where you actually still have the security. Or you could include closed positions. And if you include closed positions, how far back do you want to go? Like how far back do I want to look to see how much interest I accrue? And so and that's just two examples. There's other examples in terms of cash ledgers and all these concepts. There's many, many, many, many ways you can slice and dice the data in terms of granularity, time period and type of data. And that there was the allocation that that the copying was of the way in which this data is displayed, that it's displayed in precisely the same. I mean, it would help me. You said you started by saying that that you are alleging copying. If you could be very specific about what you say is what has been copied. Yes. So in the Nautilus. And I understand your argument. It's not just copying. Yes. So in the Nautilus example, it is copying of the RSL files and the Geneva loader that was embedded into their Nautilus application and that they use to execute the commands on Geneva. That's copying. OK. In the reporting, it is copying because the spreadsheets say at various points, let's report this value the same as Geneva. So there is copying. But there's also what I would call gap analysis where they say Geneva does all the following things and we have to find a way to do that, too. And again, I go back to the definition of misappropriation. And we cited the case, the Epic, Epic Systems case, where it was exactly that. It was just lining up two products saying, what does theirs do? What does ours do? That's exploitation. And if the concepts were so obvious and so public that all you need to do is benchmark against a textbook or against known data, why do you line it up against Geneva? Why do both of these spreadsheets essentially compare to Geneva? And at the pleading stage where all inferences have to be made in our favor and you have to look at it in the light most favorable to us, the fact that they're doing these spreadsheets, that they're comparing to Geneva, that they're obviously using Geneva to help them figure out how they're going to enhance their product, that's enough at the pleading stage. And I understood you to say that actual copying wasn't even necessarily required by the statute. That's correct. The use for economic advantage. That's correct. Is insufficient. That's right. There's a broad definition of use. That's right. And we cite cases on that and they don't dispute the law. And that's in the restatement. That's very, very well settled that any exploitation. I'll give another example. Judge Sullivan, when he was on the district court, wrote this decision in Next Communications. And there it was using the trade secret software to develop a similar program. But it wasn't copying. It was something to the effect of they were thinking about putting in a feature that was similar to the trade secret feature. It was an unfinished. So it was never sold. It was never actually incorporated. And that was misappropriation. Of course, it's hard to erase something entirely from what you've seen if you're working in the similar. Well, that's true, Your Honor. And, you know, but there's not every time you think of something. That's true. But you turn into it. There's a very well established procedure for dealing with that. Software companies use what's called clean rooms. If you want to develop your own software and not have it tainted by your exposure to something else, you do a clean room where the people doing the development have not had prior experience and they can't communicate with people that have had prior experience. Here, there was no clean room with Nautilus. And you can see the people that were improving their platform, the people that were developing Nautilus and doing these reports were lining it up against Geneva very explicitly. Not only did they have Geneva experience, but they were comparing the two to each other. And I also want to emphasize that Nautilus and this reporting, the use for reporting, that's just two examples. We also allege that they copied the data model into several components of their platform, that they used Geneva to test. Now, Judge Livingston, that's not copying, but that's exploitation. You run your data through Geneva and your own system to make sure you're getting similar results. They transitioned a customer, referred to as customer B in the complaint, from Geneva to Trinity in eight months when their own executive said that that type of complex transition would take at least a year. And they instructed employees to avoid disclosing their reliance on Geneva and development materials. Any one of these things at the pleading stage, and again, trade secret cases, it's well settled. The plaintiff has relatively little ability at the pleading stage to give detail. So circumstantial evidence is sufficient. Any one of these things alone would be sufficient to establish misappropriation. Now, you also, during the course of discovery, brought forward documents to the district court that supplemented your trade secret allegations. Yes, we did do that. But those are not incorporated in this complaint. They're not. No, they're not incorporated in the complaint. And the complaint stands on its own for purpose of 12b-6 analysis. But I do think that those supplements are important and relevant for the following reasons. One is that one of the rationales for why the standard for pleading trade secret identification is low, there's no special pleading standard, it's just rule 8 notice pleading, is that there's a separate procedure for giving more detail as appropriate. The complaint does not have to do all the work in keeping a defendant informed. And in this case, perfectly illustrates that. They had questions about the details, and we gave it to them in the form that they requested. So that's one reason. The second reason it's relevant is that the chart that they have on page 17 of their brief, where they purport to say that our elements are generic, that's from our trade secret supplement. That's not from the complaint. But in ruling on your appeal of the dismissal of the first submitted complaint, we would not take into account the additional allegations in your supplemental complaint. That's fair, Your Honor. But that means you can't include, you can't consider their chart on page 17. And if you are going to look at that in connection with the second amendment complaint, then you have to look at the whole thing, because we have thousands and thousands of elements that we are really turning into a summary judgment motion. We're not at summary judgment. And the standard is much different. And we prefer to be at a motion to dismiss at this point. And so and then the third reason, I think, that the trade secret supplements just to kind of finish it out, is that on this issue of prejudice and whether they would be prejudiced by our amendment, one of the considerations is, is this new? And it wasn't new. I mean, we put this in writing very, very detailed and gave it to them and to the court all the way along. So I think that's very clear, given the pleading standard, all inferences in our favor, given the breadth of the definition of misappropriation for pleading purposes, we have alleged it in the first amendment complaint. The second amendment complaint should also have been permitted, and I'll be brief on this. Under this court's binding precedents in Williams and Loralee, it is an abuse of discretion for a district court to deny repleting because a plaintiff waited to amend until receiving guidance from the court. With this court in Loralee referred to as a definitive ruling from the district court, the plaintiff was entitled to wait for that. And that rule applies post-judgment, as illustrated by Fomen and Williams, and by Metzler, which says that it's a manifest injustice to deny repleting under those circumstances. The circumstances of this case clearly show that manifest injustice. The motion to dismiss decision was the first and only guidance we got from the district court about the sufficiency of our complaint. There was never a conference, never an oral argument, never a hearing. Did you ever have a chance to file a motion for reconsideration? It looked to me like the judgment was entered like within moments of the district court's opinion. Immediately. So we had no chance. I mean, it was immediately the judgment. And yes, that's correct, Your Honor. And we wanted to give the court a chance because, as we point out, he overlooked a number of our allegations. And so that's why we filed the motion to replete with a new complaint that addressed the issues. The only guidance he gave us during the two and a half years that this was pending was to advance and conclude discovery. And not only did we do that, but we bent over backwards to keep the court and our adversary fully informed of the facts that we were finding. And we didn't just put those supplements on the docket. I want to emphasize that Judge Reif had a procedure where you do status letters. And in March of 2023, we wrote a status letter to Judge Reif and we said, this is an issue in the motion to dismiss the identification of trade secrets. The defendant continues to make an issue out of it. And we are going to proactively respond with this trade secret supplement. We showed him where it was on the docket and we summarized what it was. So we made it very, very clear. We never heard that, no, this is the wrong procedure. You shouldn't do it this way, you know, et cetera. And then when the judge did rule, you can see from his decision, he says, oh, if only you had alleged how long it typically takes to develop Geneva, if only you had alleged that some of these components were unique. And we were like, well, we not only can we, but we have in the documents that you've seen, so please just let us change the label from trade secret supplement to amended complaint and proceed to a decision on the merits, which is what we're supposed to do here is get to the merits. And he said, no. And there was no prejudice to Arcesium. The second amended complaint doesn't have any new claims. It doesn't have any new parties. It's just evidence that they were fully aware of to support the existing claims. And that includes these components called seed and gear, which we described in paragraph 68 of our first amended complaint. We did not use the names, but we clearly described them as the components that feed data into and extract data from Geneva. And then in discovery, discovery correspondence, our trade secret supplements, depositions, agreed topics for Arcesium's 30B6 witnesses, they were fully disclosed. And this is all documented in our reply at pages 27 and 28. I don't think there can be any dispute that they knew, the court knew, everybody knew that seed and gear were highly relevant from the beginning. And I'll just finish by making the point that this, I think, is a, you know, Laureley is an important precedent of this court. And I think this is an even more compelling case than Laureley for amendment, because there the district court had the parties in and had a discussion with them about the sufficiency of the complaint. And the court said directly to the plaintiff, now, look, here's the discussion. You have the, you might want to amend, and if you don't, you might forego it later. And this court said, even that, the notice directly from the district judge was a Hobson's choice because plaintiff was entitled to wait for a definitive ruling. With making this argument, though, you're not conceding that your first, your first amendment complaint was inadequate. We are not. This is a, this is any alternative. And, and we do request, and perhaps I'll get to it on rebuttal, that, that the court reached this amendment issue. But the point I want to make here is that we did not even get this Hobson's choice. We never had a hearing like that. The judge made the choice for us. Dismissal of prejudice, immediately enter judgment, and no opportunity whatsoever to ever be able to respond to the very specific things he raised, which he knew from the submissions we made to him and to Arcesium that we could cure and we did cure, and he just didn't give us a chance. And that, that really is manifest injustice. Thank you. May it please the court, Jim Pastore for Arcesium. From the beginning, SSNC was engaged in what one court aptly described as the old trick of vague pleading, because experience has shown that it is easy to allege theft of trade secrets with vagueness, then take discovery into the defendant's files, and then cleverly specify whatever happens to be there as having been stolen trade secrets. Well, we, we have a complaint that is over 115 paragraphs long, and that gets into some detail of that, at least a level of specificity that I found a little difficult to understand because it was so technical. We have not articulated a standard of specificity in trade secrets. It seems to me that you're resorting to this, you know, allegations that they're hiding something and trying to get away and into your files without offering anything awfully quickly. What, what in particular was missing from this complaint that made it impossible for you to respond in a, in a meaningful way? Sure. What they have essentially done is allege trade secret protection over anything and everything having to do with their program. It is the same, every single thing that they have alleged is a trade secret has been disclosed to tens of thousands of users over 30 years in the market. Well, the users had license. Start maybe with the, with Nautilus. I mean, your adversary started with it and, and I focused on it in the complaint too, there are pretty specific allegations. And he said today that, um, that your client essentially copied the RSLs, the loader format in order to continue to service Geneva based clients and to acquire new clients, um, who, uh, by offering the same functionality. So what's deficient about the allegations? Sure. So first with respect to the RSL files and the loader formats, those are disclosed to each and every single user of the software for the last 30 years. Not only that, they are readily available online. I'll direct your attention to a confidential appendix 434 to 637. That is a 200 page document that we found online that fully discloses the RSLs, how to use them. So my point here is that the pleading is deficient because those RSLs are given to every single user of the software. That's number one. What's wrong? Is users subject to a license agreement? The, the end user, there is no evidence, uh, there, there's no allegation that every single end user, in other words, the folks who, who have hands on keyboard are, are, um, bound to confidentiality agreements. And I would direct the court to Broker Genius, which is a case that, uh, SSNC relies on and their judge Stein called the concept that these things that every single user can see, the concept that those would be trade secrets, highly counterintuitive. And there's a reason for that. This, keep in mind, if we take a step back, this is not a trade secret case where you have a group of employees who have super secret access and have stolen away a certain amount of files. And if you look at their brief at pages 35 to 38 of their brief, and if you look at the cases that they cite, every single one of them, except that Broker Genius case, involves a scenario where you have either employees secreting something away, you have someone being hired over in copy life, you had an allegation of hacking, right? That's not this case. They're saying for a period of time, you had access to our software. Now you're competing with us. Therefore, there must be trade secret misappropriation. I also want to take a step back. There was not an infinite way of doing this. This is accounting software. There are rules and regulations and even SSNC acknowledged in its original complaint, I believe it's at CA 17. That every single person who needs accounting software has to have basic accounting functionality. Number three, a lot of what they're alleging or trade secrets are these overlapping data fields. But those data fields describe financial instruments that exist in the world. They have immutable characteristics. If you were to sit here and think, what are the characteristics of a bond? I can pretty much guarantee you that every single characteristic that you would come up with is reflected in these data fields. And so the fundamental problem that we have with the issues of things like Nautilus and the loader formats and the RSL, those are by definition intended for third parties to use to integrate with the software. They've been disclosed for 30 years and there is no allegation that each and every one of those end users actually signed up to a confidentiality arrangement. In addition, the evidence is clear and I know that allegations are lacking is what I mean by that, that this was actually, in fact, kept secret. And so when you take a step back and you look at- And that goes to the question of are they trade secrets, right? Not the question of misappropriation. Correct. So if we look at misappropriation, right, and when you look at what the two jurists who were closely supervising this case said, if you look at what Magistrate Judge Wang said, she said that she had been hearing from Arcesium for quite a while about the issues with the complaint and the issues with the lack of specificity. And the citation for that is JA-244. And this is in a December 5th, 2023 hearing. And what does she say? She says, look, I think what we should do is go to summary judgment and tee up this trade secret issue. And SS&C's reaction to that is telling because their reaction is to say, no, we need more discovery. We can't tee this up, right? They don't want to get to the merits. And if you look at what Judge Reif said about this case, and if you look at what he said, if you look at the procedural history here, and this is at JA-402, right, Judge Reif explains that they filed an original complaint and we moved to dismiss. They then had the opportunity to amend with documents that they described at that time as the key documents, the crown jewels, the stuff that showed Arcesium actually stole our stuff, to be blunt. That's the documents that they relied on. And even then, they were unable to sufficiently state a claim. But still, they did not have an opportunity to amend after the district court pointed out what it saw as deficiencies in its complaint. Why is that consistent with our law? Sure. It's directly consistent with Metzler in particular and Williams in particular. In every single one of those cases, the individuals, here the distinction is that they did have an opportunity to amend. They had a first amended complaint. They then tried to amend a second time. But they didn't, that first amended complaint was done without the benefit of the district court's analysis of the issues, right? But I think that overlooks a couple of important things. The first one is, with a sophisticated party, sophisticated counsel like this, when Magistrate Judge Wang says to them, look, I don't know why you filed this consolidation motion instead of trying to satisfy Rule 16 and file an amendment, but I'm beginning to understand what Arcesium has been saying about the trade secret, the lack of trade secret specificity. So if you want to file under Rule 16, go ahead. Judge Reif also pointed out that they actually did file a second, an attempt to amend the complaint through the consolidation motion. And Judge Reif specifically called that. He cites New York, City of New York v. FedEx. And he says, look, I know they called it a consolidated complaint, but a consolidated and amended complaint is still an amended pleading. And I think it's significant that Judge Reif, who is overseeing the case, the district court looks at that and says, I'm not going to allow you to amend 18 months into this case to fundamentally change this case because of the prejudice, right? I know Mr. Fischbein referred to this idea that it was to conclude discovery. But if you look at Judge Reif's August 20th, 2025 opinion, what he explains is that he denied the, he denied the motion to consolidate, to amend really, because of the prejudicial impact that it would have on RC2. It was adding a new antitrust theme and a different kind of action altogether, wasn't it? I just didn't. It was adding an antitrust action. No, actually, what, so 18 months into discovery, right? And we have three quarters of a million pages. This is not your typical case where they didn't have the ability to try to amend. We had depositions of some of our most senior executives. We had produced a live version of the software, the entire development history. Eighteen months in, they instead file a separate complaint against D.E. Shaw. They say D.E. Shaw is, in fact, the mastermind. And they say, actually, this isn't about Trinity after all. It's not about Nautilus after all. It's about Seed and Gear, which is undisputed. Arcesium did not create those programs. D.E. Shaw did. Arcesium did not create those programs. And, in fact, didn't even exist at the time those programs were created. And so that's a real tell. If you look at the second amended complaint, the vast majority of those allegations relate to Seed and Gear, which were programs that Arcesium didn't even create. And I think it's also telling that, to the extent that you look at the 59E question, if you look at Metzler and you look at Williams, right, what SS&C is arguing is that 15A displaces 59E. It doesn't. This Court has been quite clear about that. There is a step in there where you first have to satisfy 59E. They haven't even tried to do that. If you look at their brief, the argument is that's just the wrong standard. 59E doesn't apply. And that is flatly inconsistent, not only with this circuit's precedent, but also with Blombank. So you don't even get that. The spirit of Lorelei is before you throw someone out irrevocably from court, they need to have an opportunity to see the district court's analysis of where their complaint is insufficient and to amend and address those insufficiencies. Why does that apply here? It doesn't apply here because if you look at how Judge Reif describes it at JA 399, what he says it's precisely the sort of free, calculated, and deliberate decision that does not warrant vacator. It does not warrant a second chance. So what's different? They amended the complaint already. They amended it with the benefit of what they described as the crown jewel discovery. They tried to amend a second time through a bizarre consolidation motion. It was denied because of the prejudicial impact that it would have on Arcesium. They then wait a year. The consolidation decision was in January of 2024. The motion... My point is at no point did they have the district court's analysis of deficiencies in the complaint that they had pending. So we strongly disagree with that because Magistrate Wang was quite clear that she was concerned there were deficiencies in the complaint. It's the same deficiencies that I personally have been bringing up since literally the first conference in this case. So this is nothing like those other cases. You have 18 months of extensive, detailed discovery where they at any time could have actually moved to amend. And I think it's very telling. If you look at Judge Wang's commentary in that December 5th conference, and she's the one who's supervising the case. We're in front of her more than a half dozen times. And what she says is, I don't think you've shown the good cause needed to amend this complaint because you waited. And maybe that's why SS&C did what it did. I think that's very telling when you have two independent jurists looking at this and saying, you had every opportunity. Instead of sending... They could have, but they didn't have the benefit of a decision from the Court of International Trades judge. But I think at the end of the day, there's nothing requiring that cases are dismissed with prejudice. Here, they had the opportunity to amend, right? I think we're skipping over that. And they want to act as if they didn't have that opportunity to amend. They did with what they described as the crown jewel documents, number one. Number two, you have the situation where you had an extensive discovery record. So this is not those cases where it's much more typical. You have a complaint is filed. There's really no discovery. There's a dismissal. And then the court slams the door. And the third thing I would say is in those other cases, right, there's not this in-depth description of why there is the denial. And if you look at Judge Reif's well-reasoned August 20th, 2025 opinion, he lays out in detail why they don't get a chance on this record, having done what they've done, to amend. So what types of allegations were necessary in order to make this a sustainable complaint, in your view? Yeah, so, look, obviously, it's not our job to put it, but what's... No, no, no, but we don't have a very clear standard about what use means and how to get passed. But then there are no special pleading rules on misappropriation. There are on fraud, for example. So you can tell me, you know, what kinds of things needed to be alleged. Sure. I think what's missing here, fundamentally, at the end of the day, there's three things I would say. The background is you're dealing with accounting standards, you're dealing with financial instruments that exist in the world. And so, by definition, there's only a limited number of ways to do things. But for me, what the biggest thing is, is every single thing that they're trying to claim trade secret protection over has been disclosed to tens of thousands of users for the past 30 years. There is no secret sauce. What's missing is, you know, we didn't have... Arcesium didn't have any special access. So I would say what's missing is something that is truly secret in the sense of this is the thing that we do differently that no one else had access to, that we're not out there in the market giving lectures on, giving seminars on, that you can't find it online. And they can't point to anything in their first or their proposed second amended complaint that hasn't already been disclosed. So I think, fundamentally, that's what's missing. And the two jurors who are looking closely at this and looking at the conduct in this case said, look, you had every opportunity to really try and nail this down. But just saying that it's some sort of big everything... Hal, if you could address the Nautilus allegations again, because the district court didn't give us an analysis of those. And let's assume that they are trade secrets. I hear you that they're published, they're out in the world. Your adversary says it was always pursuant to a licensing agreement with confidentiality provisions. So why isn't there enough on the misappropriation prong there? There's an allegation of similarity. There's an allegation of access, obviously. And then I guess there's their allegations of the speed at which this program was rolled out when there was an obvious need from their client's perspective. Well, so let me start with the last part of that. There's no allegation of what the typical timeline would be, none. There's absolutely nothing in there. And so it's not surprising that Arcesium, with its wealth of experience, could develop this program within three years. So I think that's period, end of story. The problem with the allegations around Nautilus is not only... This is software that is designed to integrate. And we are licensed and continue to be licensed, by the way, to provide services to folks. And so the point here is that those RSLs, they're distributed to everyone, and we are actually authorized to use it. And so what you're seeing in this Blunderbuss complaint is they're kind of mixing and melding different things, but you're never really getting at the heart of the issue, which is there is nothing secret here. And to the extent they're pointing out these similarities, they're probative of the fact that it's accounting software, not that there's been misappropriation. I see them over time, but thank you. On the secrecy point, of course, that's a fact issue. And we do allege that Geneva is exclusively distributed by license with confidentiality provisions. That is in paragraphs 16 and 26 of our First Amendment complaint. There are not tens and tens of thousands of licensees. SS&C currently has about 350 Geneva licensees. They all have a contract. We also put into the complaint the hosted reseller agreement between us and Arcesium, which has confidentiality provisions. And it also, if you look at the addendum to that HRA, which exhibits C1 to the HRA, that's a sample contract with a direct customer. So in other words, in the HRA, we said, OK, if you sign up a customer, they have to agree to this confidentiality. So it's all in there, the confidentiality. The manual they're talking about has a confidentiality designation on it. It was put up on a third-party website, not by us. We took it down. Whether we had reasonable measures is a fact question. We have alleged plenty in the complaint to say that RSLs, Geneva Loader, all these things are confidential. On the amendment issue, and Metzler in particular, we would be very happy to have the situation that the plaintiffs in Metzler had. This Court's decision emphasized that in that case, the district court, Judge Fela, issued a thorough opinion pointing out what the deficiencies were, and the plaintiff had the opportunity to address it. The reason repleting wasn't allowed in Metzler is because they wanted to do it again after they already had the judicial guidance. So you get judicial guidance once, at least we never had it. Why wasn't a magistrate judge Wang's commentary about what was missing sufficient? Sure, so two reasons. One is that in Loralee, the Court made very clear, you're entitled to a definitive ruling from the district court. Remember in Loralee, it was Judge Sullivan, the person who was gonna decide the motion to dismiss was the one who gave the guidance. And because it was at a conference and not a definitive ruling, they said that doesn't count. So here clearly, Magistrate Wang wasn't deciding the motion to dismiss. But if you look at those conferences, what she was pointing to is, have you identified your trade secrets? If we had amended on that basis, it would have been a waste of time because Judge Wright found that our identification was fine. That's the whole point. That's the reason you get to wait is because you wanna hear from the decision maker what the specific flaws are so you can fix them. Nothing Judge Wang said would have tipped us off that there was a problem with misappropriation. And I think Loralee and Cresci and these other cases make very clear, you're entitled to guidance from the district court. And I'll just end by saying that I do think this is a case where the parties and everybody could really use some guidance from this court. And since we filed our briefs in this case, Judge Wright also dismissed the companion, the related D.E. Shaw case. In the briefs, we had said that was Penney, but now he's dismissed that for misappropriation, lack of misappropriation as well. So that's three decisions where he has firmly ruled that we have no case. The initial one dismissing us, no opportunity to amend, and now D.E. Shaw. And this court, just give me one second. In the International Code Council case, 43F4 at page 56, which we cite in our reply, this court said it was particularly appropriate to decide the sufficiency of a complaint rather than remanding on that issue. Because this court had what they said was a substantially different view of the case from the district judge. And here, if you accept our position that Judge Wright repeatedly misapplied basic leading principles, okay, by ignoring lots of our complaint, by making factual findings, by not giving us a chance to amend, it would be prudent to fix those errors now so that we can promptly and efficiently finish discovery and get to a resolution on the merits. Which, if there's any proposition that this court has been strong on for the last 50 years, it's that. Resolve it on the merits. And that is not happening. We've been at this for five years and we've gotten really, made very little progress. And so for that reason, we would ask that you sustain the First Amendment complaint but also give direction to Judge Wright that we're allowed to proceed with an amendment. Thanks. Thank you both. And we will take the matter under advisement. Well argued. Thank you.